# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 7, 2014        Decided September 12, 2014

No. 12-5327

ROY A. DANIEL, ET AL.,
APPELLANTS

v.

ISAAC FULWOOD, JR., CHAIRMAN OF THE UNITED STATES
PAROLE COMMISSION, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00862)

*Kenneth J. Pfaehler* argued the cause for appellants. With
him on the briefs was *Deborah Golden*.

*Alan Burch*, Assistant U.S. Attorney, argued the cause for
appellees. With him on the brief were *Ronald C. Machen Jr.*,
U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.
*Michelle Lo*, Assistant U.S. Attorney, entered an appearance.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit
Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: The plaintiffs in this case are prisoners who violated District of Columbia criminal laws before March 3, 1985. They contend that the United States Parole Commission contravened the Ex Post Facto Clause of the Constitution by retroactively applying parole guidelines that it issued in 2000, instead of applying the guidelines that were in place at the time of their offenses. The district court dismissed their complaint for failure to state a claim. Because the plaintiffs have plausibly alleged that the application of the 2000 guidelines creates "a significant risk of prolonging [their] incarceration," *Garner v. Jones*, 529 U.S. 244, 251 (2000), we reverse and remand for further proceedings.

I

At the time the plaintiffs committed their offenses, the District of Columbia Board of Parole made parole decisions for prisoners sentenced under the District of Columbia Code. Under the guidelines applicable at that time -- which had been issued in 1972 -- a prisoner became eligible for parole after serving the minimum sentence imposed by the sentencing court. 9 D.C.R.R. §§ 104.1, 105 (1972) (App. 379-456) (the "1972 Guidelines"); *see* D.C. Code § 24-203(a) (1973) (now § 24-403(a)); *id.* § 24-204(a) (1973) (now § 24-404(a)). To guide the Board's decisionmaking regarding whether and when to actually parole a prisoner, the guidelines listed a set of factors that included, "[a]mong others," the nature of the prisoner's offense, his prior criminal history, his personal and social history, and his institutional experience (including behavior in prison, involvement in academic and vocational programs, etc.). *See* 9 D.C.R.R. § 105.1 (1972). The 1972 Guidelines contained no prescribed method for "translat[ing] the factors into a parole release date." *Phillips v. Fulwood*, 616 F.3d 577, 579 (D.C. Cir. 2010).

In 1987, the Board replaced the 1972 Guidelines with another regime. To determine whether a prisoner was suitable for parole, the 1987 Guidelines employed a system of points related to offender history, offense characteristics, and behavior while in prison. *See* D.C. MUN. REGS. tit. 28, § 204 (1987) (Appellants Br., Ex. 16) (the "1987 Guidelines"). The resulting point total determined whether parole would be granted, *id.* § 204.19, although the Board could depart from the point calculation in "unusual circumstances," *id.* § 204.22.

In 1997, Congress enacted the National Capital Revitalization and Self-Government Improvement Act, Pub. L. No. 105-33, 111 Stat. 712 (1997). The Act abolished the D.C. Board of Parole and directed the U.S. Parole Commission to conduct parole hearings for D.C. Code offenders. *Id.* § 11231(a)-(c), 111 Stat. at 745. In 2000, the Commission promulgated its own parole guidelines for those D.C. Code offenders who became eligible for parole on or after August 5, 1998, including the plaintiffs in this case. 28 C.F.R. § 2.70 *et seq.* (the "2000 Guidelines").

The 2000 Guidelines establish a different point-based system, which adds a range of months, beyond the time a prisoner is *eligible* for parole, that must be served before he is regarded as *suitable* for parole. *See id.* § 2.80(*l*). A District of Columbia prisoner is eligible for parole when he has served (with certain adjustments) the minimum sentence imposed by the sentencing court. *See* D.C. Code § 24-403(a) (formerly § 24-203(a)); *id.* § 24-404(a) (formerly § 24-204(a)).[1] Merely being eligible for parole, however, does not guarantee that a

---

[1]*See also* D.C. Code §§ 24-221.01(b), 24-221.01a(b) (providing that educational and meritorious good time credits are applied to the minimum term of imprisonment to determine the date of eligibility for parole).

prisoner will actually be granted parole. Rather, once a prisoner is eligible, the Commission then determines whether he is suitable for release. *See* 28 C.F.R. § 2.73(b).

Under the 2000 Guidelines, the first step in the suitability determination involves assigning points based on the prisoner's risk of recidivism (his "salient factor score"),[2] the presence of violence in his current or prior offenses, and whether the current offense involved the death of a victim or an otherwise high level of violence. *Id.* §§ 2.20, 2.80(c), (f). The sum of these points, called the prisoner's "base point score," corresponds to a range of months to be served by the prisoner, called his "base guideline range." *Id.* § 2.80(f), (h). That range of months is added to the number of months until the prisoner's parole eligibility date, and adjusted upward for "significant disciplinary infractions" and downward for "superior program achievement." *Id.* § 2.80(j)-(*l*).

This calculation produces the prisoner's "total guideline range" for his initial parole hearing: the total range of time the prisoner must presumptively serve before he is suitable for parole. *Id.* § 2.80(*l*); *see id.* § 2.80(b); *Phillips*, 616 F.3d at 579. At subsequent reconsideration hearings, the Commission "[a]dd[s] together the . . . Total Guideline Range from the previous hearing, and the . . . guideline range for [any] disciplinary infractions since the previous hearing," and "[t]hen subtract[s] [any] award for superior program achievement." *Id.* § 2.80(m). Although the Commission may "grant or deny parole to a prisoner notwithstanding the guidelines," it may do so only in "unusual circumstances." *Id.* § 2.80(n)(1).

---

[2]The salient factor score is based on such factors as the number of the prisoner's prior convictions, the number of his prior commitments to facilities, and his age at the commencement of his prior offenses and commitments. *See* 28 C.F.R. § 2.20.

Plaintiffs Abdus-Shahid Ali, Percy Jeter, and William Terry were all convicted for conduct during the period in which the 1972 Guidelines were in effect. Compl. ¶¶ 14, 16, 17. By the time they became eligible for parole, however, the 2000 Guidelines were in place. Based on those guidelines, at Ali's initial parole hearing the Commission calculated (after correcting for errors) that he had to serve an additional 98-128 months beyond his minimum sentence before he would be suitable for parole. *See id.* ¶¶ 240-41, 248-50. At Jeter's initial hearing, the Commission calculated that he had to serve an additional 72-120 months beyond his minimum sentence. *See id.* ¶¶ 211-12. And at Terry's first hearing under the 2000 Guidelines, the Commission calculated that he had to serve an additional 156-222 months. *See id.* ¶¶ 276-77.[3] At subsequent reconsideration hearings, the Commission added a number of months to the maximum (but not to the minimum) of Jeter's total guideline range. *Id.* ¶¶ 216, 220. The Commission found no "unusual circumstances" in any of the three prisoners' initial or subsequent hearings and declined to depart downward from the ranges of months calculated under the guidelines. *Id.* ¶¶ 213, 217, 221, 251, 274, 280, 286.

On May 25, 2010, plaintiffs Jeter, Ali, and Terry filed a class action complaint against the Commissioners of the U.S. Parole Commission, alleging that they have subjected the plaintiffs and the class they represent to retroactively increased incarceration, in violation of the Ex Post Facto Clause of the

---

[3]Because the Commission developed its approach in a series of regulations between 1998 and 2000, it conducted Terry's initial parole hearing under a hybrid regime that incorporated some but not all provisions of the 2000 Guidelines. *See* Compl. ¶¶ 72-75, 263, 270-75; Commissioners Br. 11-12. The differences are immaterial for purposes of the disposition we reach in this opinion.

Constitution.[4]  The alleged class consists of persons currently incarcerated for violations of the D.C. Code committed before March 3, 1985, and whose first parole hearings occurred on or after August 5, 1998. Compl. ¶ 10.  The complaint alleges that the Commission has conducted parole hearings for this class under the 2000 Guidelines, rather than under the 1972 Guidelines that were in effect when the class members committed their offenses. *Id.*  The plaintiffs contend that the retroactive application of the 2000 Guidelines has exposed them to a significant risk of prolonged incarceration.

On September 30, 2011, before any discovery was taken and without reaching the class certification issues, the district court granted the defendants' motion to dismiss the complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  Thereafter, the plaintiffs filed a timely notice of appeal.

II

We review de novo a district court's dismissal of a complaint for failure to state a claim. *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 253 (D.C. Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A

---

[4]Three other prisoners filed along with the plaintiffs:  Roy A. Daniel, Alfonso Taylor, and Harold Venable.  Each has since been paroled. Commissioners Br. 1.  The Commissioners' brief states that the Commission has set an "effective parole date" for Jeter of July 23, 2014. *Id*.  The parties have not advised the court whether he has in fact been paroled.  According to the Commissioners, the "effective parole dates" for Terry and Ali are not until 2015. *Id.*

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

The Constitution provides that "No . . . ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. In order to prevail on the merits of an ex post facto claim with regard to parole guidelines, a plaintiff must show that retroactive application of the new guidelines "creates a significant risk of prolonging [his] incarceration" as compared to application of the prior guidelines. *Fletcher v. Reilly*, 433 F.3d 867, 877 (D.C. Cir. 2006) (quoting *Garner*, 529 U.S. at 251) (internal quotation marks omitted).[5]

The Commissioners maintain that "the comparisons [the plaintiffs] attempt between the current parole schemes and the 1972 DC Regulations are hopelessly indeterminate in light of the fundamentally different methodologies of the old and new systems, as well as the broad discretion available under both." Commissioners Br. 3. Comparison is effectively impossible, the defendants argue, because of "the broad discretion available under the 1972 DC Regulations, and the narrower but still relevant discretion available to the Commission under the 2000 Guidelines." *Id.* at 26. The Supreme Court has made clear, however, that although "[w]hether retroactive application of a

---

[5]The Commissioners contend that parole guidelines are not "laws" subject to the Ex Post Facto Clause. As they acknowledge, this circuit has rejected that argument. *See* Commissioners Br. 40-41 (citing *Fletcher v. District of Columbia*, 391 F.3d 250, 251 (D.C. Cir. 2004)); *see also Fletcher v. Reilly*, 433 F.3d at 876-77.

particular change in parole law respects the prohibition on ex post facto legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account," *Garner*, 529 U.S. at 250, the "presence of discretion does not displace the protections of the *Ex Post Facto* Clause," *id.* at 253.  As we said in *United States v. Turner*, "under the law of this circuit the existence of discretion does not foreclose an *ex post facto* claim."  548 F.3d 1094, 1100 (D.C. Cir. 2008) (citing *Fletcher*, 433 F.3d at 876).

An inmate may establish the requisite risk of increased incarceration in two ways.  *See Fletcher*, 433 F.3d at 877.  First, he may demonstrate that the new regulation "by its own terms show[s] a significant risk" of prolonging his incarceration. *Garner*, 529 U.S. at 255.  Second, he may "demonstrate, by evidence drawn from the rule's practical implementation by the agency charged with exercising discretion, that its retroactive application will result in a longer period of incarceration than under the earlier rule."  *Id.*; *see Fletcher*, 433 F.3d at 877.  At the motion to dismiss stage, of course, a plaintiff need only show that his ex post facto claim -- like any other claim -- is "plausible."  *Iqbal*, 556 U.S. at 678.

A

The plaintiffs' strongest argument in support of their ex post facto claim is that the 2000 Guidelines create a presumption of a long period of extended incarceration in their cases, while the 1972 Guidelines would not have done so.  As described in Part I above, the 2000 Guidelines employ a number of specific factors and adjustments to generate a range of months that is added to the number of months remaining until the date the prisoner will have served his minimum sentence (his parole eligibility date), thus generating a total range of months that the prisoner must presumptively serve before he should be paroled

(his parole suitability date). *See* 28 C.F.R. § 2.80(*l*) (instructions for determining total guideline range). Under 28 C.F.R. § 2.80(n), the presumption holds unless "unusual circumstances" warrant departure from the prisoner's total guideline range.[6]

Misconstruing the plaintiffs' presumption argument, the Commissioners contend that § 2.80(n) does not create a presumption because it permits but does not require the Commission to depart upward from the guideline range in unusual circumstances. Commissioners Br. 38-39. The plaintiffs' argument, however, is that both upward and downward departures from the guidelines require a showing of "unusual" circumstances. *See* 28 C.F.R. § 2.80(n)(1). This, they explain, effectively creates a presumption that, in the usual case, the guideline range will govern a prisoner's period of parole unsuitability.

With respect to their specific circumstances, plaintiffs Ali, Jeter, and Terry allege that the Commission's actual application of the 2000 Guidelines to their cases generated guideline ranges that presumptively required them to serve additional time, beyond the point of parole eligibility, in the amounts of 98-128 months, 72-120 months, and 156-222 months, respectively. *See*

---

[6]*See* 28 C.F.R. § 2.80(b) ("In determining whether an eligible prisoner should be paroled, the Commission shall apply the guidelines set forth in this section. . . . Decisions outside the guidelines may be made, where warranted, pursuant to paragraph (n) of this section."); *id.* § 2.80(n)(1) ("The Commission may, in unusual circumstances, grant or deny parole to a prisoner notwithstanding the guidelines. . . . In such cases, the Commission shall specify in the notice of action the specific factors that it relied on in departing from the applicable guideline or guideline range."); *see also Sellmon v. Reilly*, 551 F. Supp. 2d 66, 73 (D.D.C. 2008) ("Until a parole candidate has served a period of time equal to the bottom of his total guideline range, the candidate is presumed to be unsuitable for parole.").

Compl. ¶¶ 211-12, 240-41, 248-50, 276-77. They further allege that the Commission found no "unusual circumstances" warranting downward departures from those guideline ranges. *Id.* ¶¶ 213, 217, 221, 251, 274, 280, 286. These are factual allegations that a court must accept for purposes of reviewing a motion to dismiss under Rule 12(b)(6). *See Iqbal*, 556 U.S. at 679. The Commissioners do not contest them.

It may be that the factors that led the Commission to add time to the plaintiffs' periods of incarceration under the 2000 Guidelines are factors that the D.C. Board of Parole could also have considered under the 1972 Guidelines. Under the text of the 1972 Guidelines, however, there would not have been a presumption that the plaintiffs should serve significantly more time than their minimum sentences. *See* 9 D.C.R.R. §§ 105, 105.1 (1972); *see also* D.C. Code § 24-204 (1973). It is appropriate, in assessing the risk of increased punishment created by a subsequent parole system's implementation, to consider a parole board's written policies. As the Supreme Court said in *Garner*, "[a]bsent a demonstration to the contrary, we presume the Board follows its statutory commands and internal policies in fulfilling its obligations." 529 U.S. at 256. And we think it reasonable to infer that the presumption of extended unsuitability contained in the 2000 Guidelines would prolong a prisoner's period of incarceration as compared to the 1972 Guidelines -- in which no such presumption existed -- even if the same factors could have been considered under the earlier regime.[7]

---

[7]*Cf. Fletcher*, 433 F.3d at 879 (concluding that "facial distinctions between the Board's [1987] regulations and the [2000] federal regulations" regarding reparole "made out a prima facie case that [the prisoner's] rights under the Ex Post Facto Clause have been violated" and were "sufficient to warrant factual development on his habeas petition").

Our focus on the effect of a presumption is consistent with the analysis the Supreme Court employed, in *Miller v. Florida*, in concluding that the application of revised sentencing guidelines to a petitioner who committed his offense before the revised guidelines' effective date violated the Ex Post Facto Clause. *See* 482 U.S. 423 (1987). Under the Florida guidelines in effect when Miller committed his offense, the "presumptive sentence" was 3.5 to 4.5 years' imprisonment. *Id.* at 424. Under the revised guidelines, the presumptive sentencing range was 5.5 to 7 years' imprisonment. *Id.* The Court held that the revised guidelines violated the Ex Post Facto Clause because Miller had been "substantially disadvantaged" by their application. *Id.* at 432.[8] As we subsequently explained in applying *Miller* to post-offense revisions of the U.S. Sentencing Guidelines, "[i]t was no answer to say that the defendant might have received the same sentence under the old version of the guidelines. While the Florida trial court was not bound to give the presumptive sentence, the court's discretion to give a different sentence was quite limited, and so as a practical matter the change in the guidelines increased the defendant's sentence." *Turner*, 548 F.3d at 1099 (citations omitted).[9]

---

[8]In *Peugh v. United States*, the Supreme Court confirmed that "the result in *Miller* remains sound" -- notwithstanding that it "employed a 'substantial disadvantage' test that th[e] Court has since abandoned" in favor of asking "whether the change in law creates a 'sufficient' or 'significant' risk of increasing the punishment for a given crime." 133 S. Ct. 2072, 2083 n.4 (2013) (quoting *Garner*, 529 U.S. at 250-51).

[9]The presumptive effect of the Florida guidelines was generated by the requirement that, if a "court wished to depart from the guidelines range, . . . it was required to give 'clear and convincing reasons in writing for doing so,'" and a non-guidelines sentence was subject to appellate review. *Peugh*, 133 S. Ct. at 2082 (quoting *Miller*, 482 U.S. at 426). In *Miller*, the government's contention was that the

As the Supreme Court held just last year, "*Miller* thus establishes that applying amended sentencing guidelines that increase a defendant's recommended sentence can violate the *Ex Post Facto* Clause, notwithstanding the fact that sentencing courts possess discretion to deviate from the recommended sentencing range." *Peugh v. United States*, 133 S. Ct. 2072, 2082 (2013). So, too, here. Under the 1972 Guidelines, the plaintiffs were not subject to any recommended period of parole unsuitability at all, and they could have been paroled immediately upon serving their minimum sentences. *See* D.C. Code §§ 24-203(a), 24-204(a) (1973); 9 D.C.R.R. §§ 104.1, 105 (1972). Under the 2000 Guidelines, by contrast, they are subject to guideline ranges that far exceed those minimum sentences. Once again, it is "no answer to say that the [plaintiffs] might have received the same sentence[s] under the old version of the guidelines." *Turner*, 548 F.3d at 1099. Although the Board could have imposed the same periods of incarceration under the 1972 Guidelines, there was no presumption that it do so. And while the Commission "was not

plaintiff could not show that his sentence under the new guidelines was longer than it would have been under the old ones because a judge could have imposed the same sentence by departing *upward from the old guidelines*. *See* 482 U.S. at 432. The Court rejected that argument because "the sentencing judge would have to [have] provide[d] clear and convincing reasons in writing" to impose the longer sentence under the old guidelines, while he would not have to do so under the new guidelines. *Id.* at 432-33. In this case, the government makes an argument from the opposite direction: that under the 2000 Guidelines the Commission has the same discretion to impose a shorter unsuitability period as it did under the 1972 Guidelines because it can depart *downward from the new guidelines* in "unusual circumstances." (As in *Miller*, the Commission must specify the reasons for a guideline departure in writing. *See* 28 C.F.R. § 2.80(n)(1).) The direction of the required departure makes no material difference in the relative persuasiveness of these arguments.

bound" to impose the presumptive ranges under the 2000 Guidelines, *id.*, its discretion to depart was limited, *see* 28 C.F.R. § 2.80(n). Hence, it is more than plausible that the change in parole regimes increased the prisoners' periods of incarceration. Consequently, the plaintiffs' ex post facto claim should not have been dismissed.

B

The plaintiffs press a number of additional arguments in support of their contention that the 2000 Guidelines create a significant risk of prolonged incarceration as compared to the 1972 Guidelines. Although we briefly note some of them here, we do not need to resolve their merits because the considerations that we have addressed in Part II.A are sufficient to require reversal of the dismissal of the complaint.

First, the plaintiffs argue that the 2000 Guidelines do not take into account several factors that the 1972 Guidelines considered and that would favor their earlier release. Compl. ¶¶ 101-13. Those include "rehabilitative efforts, institutional behavior, [and] self-improvement efforts" while in prison that did not rise to the level of "superior" efforts. *Id.* ¶ 106; *see* 9 D.C.R.R. § 105.1(e) (1972). They also include mitigating circumstances surrounding their criminal conduct, as well as community resources available to the parolee upon release. Compl. ¶ 113; *see* 9 D.C.R.R. § 105.1(a), (f). These factors are not expressly accounted for in the 2000 Guidelines' calculation of the range of months to be served before parole suitability. *See* 28 C.F.R. §§ 2.20, 2.80; *see also id.* § 2.80(k), (*l*)(1) (providing a subtraction only for "superior" program achievement). By contrast, they are expressly listed among the "factors considered" in the 1972 Guidelines. *See* 9 D.C.R.R. § 105.1(a) (mitigating or aggravating circumstances surrounding the offense); *id.* § 105.1(e) ("efforts put forth" in institutional

programs, without a limitation to "superior" efforts); *id.* § 105.1(f) (available community resources). The plaintiffs allege that each of these factors would apply to their individual cases. *See* Compl. ¶¶ 223-26, 231-32, 253-57, 260-61, 288-92, 295-99.

It is true that, after the Commission calculates the range of months required before a prisoner is deemed suitable for parole, the 2000 Guidelines authorize it to consider "case-specific factors that are not fully taken into account in the guidelines." 28 C.F.R. § 2.80(n)(1). The factors to which the plaintiffs point could certainly be considered at that stage. *See id.* § 2.80(n)(2). But, once again, the Commission may utilize such factors to depart downward from a prisoner's guideline range only in "unusual circumstances," *id.* § 2.80(n)(1), creating a presumption against consideration of those factors that did not exist under the 1972 Guidelines. Hence, this argument may further support the plausibility of the plaintiffs' claim that application of the 2000 Guidelines increases their risk of prolonged incarceration.

Second, the plaintiffs argue that their claim of a significant risk of prolonged incarceration is even stronger than would appear on the face of the 2000 Guidelines because in practice the Commission "almost never" exercises its discretion to depart downward -- that is, it almost never finds unusual circumstances. Compl. ¶ 69. If true, that would render the Guidelines' presumption virtually irrebuttable, and such a presumption would suggest an even greater risk of comparatively longer incarceration.

Finally, the plaintiffs contend that their ex post facto claim is also buttressed by comparing the 2000 Guidelines with guidelines the Board adopted in 1987. Rather than merely listing factors to be taken into account in the Board's discretion

-- as was the case for the 1972 Guidelines -- the 1987 Guidelines utilized a point system to determine whether a prisoner was suitable for parole. *See* D.C. MUN. REGS. tit. 28, § 204 (1987). The plaintiffs' complaint alleges that, although different in form, the 1987 Guidelines were intended merely to articulate the practices, policies, and procedures that the Board had actually followed under the 1972 Guidelines. Compl. ¶ 37. On appeal, they maintain that the two regimes were "substantively the same," and that, as a consequence, the court can use the 1987 Guidelines as a "meaningful predictor" of results under the 1972 Guidelines. *See* Appellants Br. 21-22. They further allege that a comparison of the 1987 and 2000 Guidelines makes the relative risk of longer incarceration under the latter even clearer.

We need not resolve this argument either, because -- as we have held above -- a  direct comparison of the 1972 and 2000 Guidelines renders the plaintiffs' ex post facto claim sufficiently plausible to survive a motion to dismiss. The argument based on the 1987 Guidelines, like the others addressed in this subpart, can be examined on remand to determine whether it further supports the plaintiffs' claim. In that regard, we note that the Third Circuit, in a case involving a habeas petitioner convicted in the District of Columbia and incarcerated within that circuit, did rely on the 1987 Guidelines as reflective of practice under the 1972 Guidelines. Employing the 1987 Guidelines in that fashion, the court concluded that the petitioner had made out a prima facie ex post facto challenge to the application of the 2000 Guidelines in his case. *See Brown v. Williamson*, 314 F. App'x 492, 497 (3d Cir. 2009); *see also Puifory v. Reilly*, No. 3:08-CV-982, 2009 WL 839354, at *6-7 (M.D. Pa. Mar. 30, 2009) (same).

## C

The Commissioners maintain that, whatever the merits of the plaintiffs' claims, they are moot and therefore nonjusticiable.

They contend that, although the "base point score" generated by the 2000 Guidelines "results in [a] potentially longer period of time before an inmate first becomes eligible for parole[,] . . . . [e]ach of the Prisoners has become eligible for parole, as shown by the fact that each has had parole hearings." Commissioners Br. 37-38. This, the Commissioners maintain, rendered the prisoners' claims of presumptively longer incarceration moot. *Id.*

The Commissioners' argument both conflates the meaning of parole "eligibility" and parole "suitability," and ignores the impact of the 2000 Guidelines on both initial and subsequent parole hearings. As we explained above, a D.C. prisoner becomes eligible for parole when (with certain adjustments) he has served his minimum sentence. *See* D.C. Code §§ 24-403(a), 24-404(a). The "base point score" and other elements of a prisoner's "total guideline range" do not extend the period of time before an inmate first becomes eligible for parole, but rather the period before he becomes suitable for parole -- i.e., when "an *eligible* prisoner *should be* paroled." 28 C.F.R. § 2.80(b) (emphasis added); *see id.* §§ 2.73(b), 2.80(i).

Nor does the impact of the prisoner's total guideline range on his parole suitability dissipate once he has had his first parole hearing. At any subsequent ("reconsideration") hearing, the prisoner's total guideline range for that hearing is calculated by "add[ing] together the . . . Total Guideline Range from the previous hearing, and the . . . guideline range for [any] disciplinary infractions since the previous hearing," and "[t]hen subtract[ing] [any] award for superior program achievement." *Id.* § 2.80(m). Accordingly, the plaintiffs' claims did not become moot simply because they received initial parole hearings under the 2000 Guidelines.

III

The text of the 2000 Guidelines and the plaintiffs' factual allegations regarding the application of those guidelines in their cases indicate that they are subject to a long presumptive period of parole unsuitability that would not have applied to them under the 1972 Guidelines. This gives rise to a reasonable inference that the 2000 Guidelines create a significant risk of prolonging their incarceration in comparison to the 1972 Guidelines. Accordingly, the plaintiffs have raised a plausible claim that the application of the later guidelines to their cases violates the Ex Post Facto Clause. We must therefore reverse the dismissal of the complaint and remand the case for further proceedings.

Because this case comes to us as an appeal from the dismissal of a complaint, the only question before us is the one we have answered in the affirmative: Have the plaintiffs stated an ex post facto claim that is plausible? We therefore have no occasion to consider what additional evidence -- if any -- beyond the facial differences between the 2000 and 1972 Guidelines the plaintiffs must develop on remand to prove their claim. Nor do we have occasion to consider what evidence the Commissioners must marshal in defense of their retroactive application of the 2000 Guidelines. As is appropriate, we leave those issues for consideration, in the first instance, by the district court.

*Reversed and remanded.*