# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 15, 2018       Decided June 25, 2019

No. 15-5207

MICHAEL ROY JOHNSON,
APPELLANT

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01127)

*Stephen S. Gilstrap*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the brief were *Zachary J. Howe* and *Jeremy C. Marwell*, appointed by the court.

*Michael R. Johnson*, *pro se*, was on the briefs for appellant.

*James M. Burnham*, Senior Counsel, U.S. Department of Justice, argued the cause for federal appellees. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *R. Craig Lawrence* and *Jane M. Lyons*, Assistant U.S. Attorneys.

2

*Karl A. Racine*, Attorney General, Office of the Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Stacy L. Anderson*, Acting Deputy Solicitor General, and *Mary L. Wilson*, Senior Assistant Attorney General, were on the brief for appellee The District of Colombia.

Before: HENDERSON and SRINIVASAN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*:  In 1990, Michael Roy Johnson pleaded guilty to an armed rape he committed while out on bond for another alleged rape.  He became eligible for parole in 2000.  At his parole hearings in 2000, 2005, and 2008, the U.S. Parole Commission denied him parole.  Each time, the Commission applied parole guidelines promulgated in 2000 rather than the 1987 guidelines in effect at the time of his offense.

Johnson brought an action claiming that the retroactive application of the 2000 guidelines in his parole hearings violated the Ex Post Facto Clause and Fifth Amendment Due Process Clause.  He also alleged that his arrest had violated the Fourth Amendment because it was unsupported by probable cause.  The district court granted a dismissal in favor of the defendants, and we affirm.

I.

A.

Because the district court dismissed Johnson's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, we "accept[] the allegations in the complaint as

true" and grant him "the benefit of all inferences that can be derived from the facts alleged." *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 284 (D.C. Cir. 2009) (citation omitted). And because Johnson brings his action pro se, we consider the complaint "in light of all filings, including filings responsive to a motion to dismiss." *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (per curiam) (internal quotation marks omitted). The following facts thus are taken from his complaint, supplemented as necessary by his other filings.

On December 27, 1989, Johnson was arrested by John Burke, a detective in the D.C. Metropolitan Police Department, and charged with armed rape. The alleged victim of the rape was Johnson's then-girlfriend. She had identified Johnson as the perpetrator and described the episode in detail, after which the police contacted him for an interview. Johnson provided a handwritten statement in which he said that he and his girlfriend had spent time together on the day in question and engaged in consensual intercourse. He described an altercation over accusations of infidelity that culminated with his girlfriend grabbing a knife to prevent him from leaving the apartment. He was eventually able to wrest the knife from her.

Detective Burke described the victim's allegations in an affidavit supporting his application for an arrest warrant, in which he stated that Johnson had "admitted to arming himself with a knife and to engaging the Complainant in sexual intercourse." Johnson Compl. ¶ 22, App. 18. Burke obtained an arrest warrant for Johnson based on the affidavit.

On March 17, 1990, Johnson was released on bond. While on release, he raped a different woman. Johnson eventually pleaded guilty to the second rape, and prosecutors dropped the first charge as part of the plea deal. Under the District of

Columbia's indeterminate sentencing scheme, Johnson received a sentence of 15 years to life imprisonment.

## B.

The National Capital Revitalization and Self-Government Improvement Act vests responsibility for parole determinations for D.C. Code offenders in the U.S. Parole Commission. *See* D.C. Code § 24-131. From 1987 to 2000, the Parole Commission (and its predecessor, the D.C. Board of Parole) applied a point system prescribed by municipal law to guide its parole determinations. *See* D.C. Mun. Regs. tit. 28 § 204.1–.22 (1987). In 2000, the Parole Commission replaced the 1987 guidelines with an updated system for assessing putative parolees. *See* 28 C.F.R. §§ 2.70–.107.

Johnson first became eligible for parole in 2000. In three successive parole hearings—in 2000, 2005, and 2008—the Commission applied the parole guidelines promulgated in 2000 rather than the 1987 guidelines in effect at the time of his offense of conviction.

The 1987 and 2000 guidelines differ in various respects. Under the 1987 guidelines, once a D.C. offender has served his minimum court-imposed sentence, he becomes "eligible" for parole. *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 69 (D.D.C. 2008). At the offender's first parole hearing, the Commission makes an initial determination whether he is "suitable" for parole—i.e., whether he will receive parole. *Id.* The guidelines prescribe an intricate scheme to determine suitability. *See* D.C. Mun. Regs. tit. 28, § 204.4–.22 (1987). The scheme assigns an offender a score of zero to five, based on several factors meant to account for an offender's risk of recidivism and his conduct while incarcerated. *Id.* At an initial hearing, scores of two and below signify someone presumptively suitable for parole, whereas scores of three and above signify someone

presumptively unsuitable for parole. *See id.* § 204.19. If the offender does not receive parole after an initial hearing, a rehearing will be scheduled by the parole commissioners. At rehearings, the cutoff for the presumption of suitability is three rather than two. *See id.* § 204.21.

In "unusual circumstances," the 1987 guidelines allow departure from the presumption of suitability for an offender to whom it applies. *Id.* § 204.22. To invoke a departure, the Commission must "specify in writing those factors which it used to depart." *Id.* The guidelines contain a worksheet setting forth certain enumerated reasons for departure. *See id.* app. 2-1. One of those reasons is an "[u]nusually extensive and serious prior record," described as "at least five felony convictions." *Id.* In addition to the enumerated grounds for departure, the 1987 guidelines enable the Commission to "depart from [the guidelines'] numerical system anytime it wishes, as long as it specifies in writing those factors which it used." *Ford v. Massarone*, 902 F.3d 309, 321 (D.C. Cir. 2018) (alteration in original) (internal quotation marks omitted).

The 2000 guidelines, like the 1987 guidelines, use a point system to help identify when an offender merits a grant of parole. *See* 28 C.F.R. §§ 2.20, 2.80. At the initial parole hearing, the Commission calculates a base score based on factors meant to measure the offender's risk of recidivism and adjusted for several other considerations. The base score is then converted into a "base guideline range." The lowest base guideline range, for offenders with a score of three or less, is zero months; and the highest range, for offenders with a score of ten, is 156 to 192 months. *Id.* At the last step of the calculation, the maximum and minimum of the range can be adjusted upward and downward based on "superior program achievement," *id.* § 2.80(k), and disciplinary infractions, *see id.* § 2.80(j). Those adjustments yield an adjusted guideline range,

which is then added to the offender's minimum court-imposed sentence to produce a "total guideline range." *Id.* § 2.80(l).

The total guideline range represents the amount of time the Commission presumes an offender must serve before he becomes suitable for parole. *See id.* At each subsequent rehearing, the Commission takes the total guideline range from the prior hearing and readjusts the range for superior achievement or infractions in the intervening period. *See id.*

The 2000 guidelines permit the Commission to depart from the guideline range. *See id.* § 2.80(n). A departure is justified in "unusual circumstances," based on "case-specific factors that are not fully taken into account in the guidelines, and that are relevant to the grant or denial of parole." *Id.* § 2.80(n)(1). The 2000 guidelines provide a list of potential factors justifying departure that is, by its own terms, non-exhaustive. *See id.* § 2.80(n)(2).

## C.

At Johnson's initial parole hearing in 2000, the Parole Commission questioned him about his 1989 arrest and the underlying allegation of rape. Despite Johnson's denial of the underlying conduct, the Commission found him guilty of the 1989 rape for the purposes of parole, based solely on the contemporaneous police report. The Commission applied the 2000 guidelines, determined that Johnson was presumptively unsuitable for parole, and calculated a recommended guideline range of twelve to eighteen months. Had the Commission applied the 1987 guidelines, Johnson would have been presumptively suitable for parole.

The Commission departed upward from the twelve-to-eighteen-month range, citing its assessment of the risk Johnson posed. The Commission gave him a sixty-month

reconsideration date, which made him eligible for rehearing in 2005. In each of his next two hearings, in 2005 and 2008, the Commission again departed upward from the guidelines for similar reasons.

In 2010, following litigation challenging the application of the 2000 guidelines to parole applicants who, like Johnson, were convicted before promulgation of the 2000 guidelines, Johnson received a parole hearing under the 1987 guidelines for the first time. The Commission determined that he was presumptively suitable for parole but opted to depart from the guidelines to deny him parole.

Johnson later filed the present action. The action includes a claim against Parole Commission members alleging that the application of the 2000 guidelines in his first three parole hearings violated his rights under the Ex Post Facto Clause and Fifth Amendment Due Process Clause. His action also includes a claim against Detective Burke and the District of Columbia contending that his original arrest for rape violated the Fourth Amendment. The complaint seeks damages as well as declaratory and injunctive relief, including expungement of his arrest record and parole file.

The district court rejected Johnson's claims and dismissed his complaint. The Commission subsequently granted Johnson parole, and he was released from prison in 2018.

Johnson now appeals. We appointed an amicus to present arguments in support of his position, and we consider both the amicus's arguments and Johnson's own arguments.

8

II.

A.

We first address the argument of Johnson and his amicus that the Parole Commission's retroactive application of the 2000 guidelines at his first three hearings violated the Ex Post Facto Clause and Johnson's argument that it violated the Due Process Clause. While Johnson sought various forms of relief in connection with that argument in the district court, the only remaining claim before us is his claim against members of the Parole Commission for damages. He does not dispute that his claim for a new parole hearing has become moot now that he has received a parole hearing under the 1987 guidelines and been released from custody. And while he initially sought expungement of the references to his first alleged rape from his parole file, the district court held that his sole avenue for expungement is the Privacy Act, and his briefing in our court contains no challenge to that holding.

The district court dismissed Johnson's Ex Post Facto damages claim because it was barred by qualified immunity and dismissed the Due Process claim on the merits. We affirm the district court's dismissal of those claims for substantially similar reasons.

1.

We initially consider the argument of Johnson and amicus that the application of the 2000 guidelines at his first three hearings violated the Ex Post Facto Clause. "[P]arole authorities violate the Ex Post Facto Clause when (i) they apply parole guidelines promulgated after an offender was convicted, and (ii) that retroactive application . . . creates a significant risk of prolonging [the offender's] incarceration as compared to application of the prior guidelines." *Ford*, 902 F.3d at 320

(alterations in original) (internal quotation marks omitted). Here, there is no dispute that the first condition is satisfied: the 2000 guidelines were promulgated after Johnson's conviction. The sole issue is whether the retroactive application of those guidelines created a "significant risk" of prolonging his incarceration as compared to application of the 1987 guidelines.

A party can establish a "significant risk" by identifying "facial distinctions between the old and new" regulations that demonstrate the requisite risk or by "introducing evidence drawn from the rule's practical implementation by the agency charged with exercising discretion." *Fletcher v. Reilly*, 433 F.3d 867, 877 (D.C. Cir. 2006) (formatting modified). "At the motion to dismiss stage . . . a plaintiff need only show that his ex post facto claim—like any other claim—is 'plausible.'" *Daniel v. Fulwood*, 766 F.3d 57, 61–62 (D.C. Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Johnson initially contends that the Parole Commission, in departing upwards under the 2000 guidelines, relied on certain factors on which it could not have relied under the 1987 guidelines. Namely, the Commission departed upward based on the dismissed rape charge; Johnson's failure to obtain psychological or behavioral treatment for sex offenders; and "offense accountability," meaning the severity of the underlying crime. Consideration of each of those factors is explicitly permitted under the 2000 guidelines but not the 1987 guidelines.

That difference does not create a "significant risk" per our decision in *Ford v. Massarone*, 902 F.3d 309. There, we rejected a virtually identical argument concerning the Commission's use of unenumerated departure factors. Assessing the relationship between the same two guidelines,

we explained that "when the Commission applies the 1987 guidelines, it can depart from [the guidelines'] numerical system anytime it wishes, as long as it specifies in writing those factors which it used." *Id.* at 321 (alteration in original) (internal quotation marks omitted). As a result, "the retroactive application of the 2000 guidelines" to permit consideration of departure factors not enumerated in the 1987 guidelines generally does "not pose a significant risk of increasing [an offender's] prison term." *Id.*

True, the Supreme Court has cautioned that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause." *Garner v. Jones*, 529 U.S. 244, 253 (2000). But our decision in *Ford* establishes that, under the 1987 guidelines, the enumerated factors are merely illustrative and have no privileged position relative to unenumerated factors. All are potential bases for a departure, and whether enumerated or unenumerated, their invocation requires no more than a written explanation. Indeed, in a letter to the court submitted after we decided *Ford*, amicus acknowledged that the decision governed this issue. Consequently, the facial differences in departure factors cannot support Johnson's Ex Post Facto challenge.

Johnson and his amicus next contend that the Parole Commission, by applying the 2000 guidelines, deprived Johnson of a presumption of parole suitability to which he would have been entitled under the 1987 guidelines. In particular, although Johnson would have received a score qualifying him for a presumption of suitability at each of his parole hearings under the 1987 guidelines, his total guideline range under the 2000 guidelines mandated that he serve an additional twelve to eighteen months above his minimum court-imposed sentence before he could be considered presumptively suitable for parole.

That argument finds support in our decisions. Considering the relationship between the 2000 guidelines and an earlier iteration, the 1972 guidelines, we wrote that it was "reasonable to infer that the presumption of extended unsuitability contained in the 2000 Guidelines would prolong a prisoner's period of incarceration as compared to the [earlier] guidelines—in which no such presumption existed—even if the same factors could have been considered under the earlier regime." *Daniel*, 766 F.3d at 63.

That "focus on the effect of a presumption" of suitability is consistent with decisions assessing the Ex Post Facto implications of revised sentencing guidelines. *Id.* at 63. In both *Miller v. Florida*, 482 U.S. 423 (1987), and *Peugh v. United States*, 569 U.S. 530 (2013), the Supreme Court affirmed that advisory sentencing guidelines can give rise to an Ex Post Facto claim even if the sentencing court retains discretion to depart or vary from those guidelines. *See Peugh*, 569 U.S. at 541. Even merely advisory guidelines, the Court explained, anchor discretion. *See id.* at 549.

The same reasoning is applicable here. Though the 1987 guidelines do not substantively limit the Commission's discretion, they provide decisional scaffolding that structures the Commission's evaluation of an offender seeking parole. The guidelines do not oblige the Commission to hew to the presumption, but they do require the Commission to begin with it. The presumption of suitability, when it applies, is thus the kind of facial difference that could support a plausible Ex Post Facto claim.

Nonetheless, Johnson's claim for damages fails for a different reason: the parole officials named as defendants are entitled to qualified immunity. The doctrine of qualified immunity shields officials from civil liability if their conduct

"does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). The result is that qualified immunity essentially "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Although the Supreme Court's decisions do 'not require a case directly on point for a right to be clearly established,' for purposes of qualified immunity, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Hedgpeth v. Rahim*, 893 F.3d 802, 806 (D.C. Cir. 2018) (quoting *White v. Pauly,* 137 S. Ct. 548, 551 (2017) (per curiam)). Much turns, then, on the level of generality at which the relevant decisions establish the pertinent right. *See id.* A plaintiff may be unable to overcome qualified immunity if the precedents define the right abstractly rather than in a manner "particularized to the [pertinent] facts." *Id*. (quoting *White*, 137 S. Ct. at 552).

Johnson's claim falls short on that ground. Months before his initial parole hearing, the Supreme Court recognized that "[t]he presence of discretion does not displace the protections of the *Ex Post Facto* Clause." *Garner*, 529 U.S. at 253. But that broadly framed principle would not have put a reasonable officer on adequate notice that the specific violation alleged here—denying a presumption of suitability in the face of essentially unfettered discretion to depart from the presumption—would entail a significant risk of a longer term of incarceration so as to violate the Ex Post Facto Clause.

Indeed, *Garner* itself acknowledged that determining the Ex Post Facto consequences of any particular change is a "question of particular difficulty when the discretion vested in

a parole board is taken into account." *Id.* at 250. Neither Johnson nor his amicus identifies any contemporaneous precedent establishing the contours of the claimed right with the requisite specificity. And because Johnson's Ex Post Facto claim for damages fails on that basis, we do not need to address the government's contention that the denial of parole under the 1987 guidelines in the 2010 hearing necessarily means that the application of the 2000 guidelines in his three prior hearings could not have created a "significant risk of prolonging [his] incarceration." *Id.* at 251.

2.

Johnson contends that the Commission's applications of the 2000 guidelines to deny him parole based on the risk he posed, including the Commission's reliance on the 1989 rape allegations, violated the Due Process Clause. We disagree.

"Parole authorities deprive an offender of due process only if their decisions are 'either totally lacking in evidentiary support or [are] so irrational as to be fundamentally unfair.'" *Ford*, 902 F.3d at 321 (alteration in original) (quoting *Duckett v. Quick*, 282 F.3d 844, 847 (D.C. Cir. 2002)); *cf. Ellis v. District of Columbia*, 84 F.3d 1413, 1420 (D.C. Cir. 1996) ("[W]e hold that the regulations do not give any prisoners a liberty interest in parole."). Here, there was evidence before the Parole Commission that Johnson had committed two rapes. Even assuming the evidence supporting Johnson's guilt of the first rape was insufficient to support the denial of parole, it is undisputed that the second rape—his offense of conviction— occurred while he was out on bond. That alone suffices to suggest a risk of recidivism and to support a rational determination that his relatively low guidelines range inadequately accounted for the risk he posed.

14

B.

Johnson next seeks damages from the District of Columbia and Detective Burke for his 1989 arrest for armed rape. Johnson contends that the arrest warrant was unsupported by probable cause in violation of the Fourth Amendment. He also seeks declaratory relief and expungement of his arrest record. We conclude that the district court properly dismissed these claims.

"Probable cause is an objective standard to be met by applying a totality-of-the-circumstances analysis." *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016) (internal quotation marks omitted). It is "more than bare suspicion but is less than beyond a reasonable doubt, and, indeed, is less than a preponderance of the evidence." *Id.*

Johnson argues that the warrant for his arrest in 1989 was unsupported by probable cause because Detective Burke's affidavit in support of the warrant application had mischaracterized the content of Johnson's statement. Johnson alleges that he informed police he had engaged in consensual sexual intercourse with his then-girlfriend (the alleged victim) on the day in question, that they then had an altercation over accusations of infidelity, and that he was able to seize from her a knife she had grabbed when she tried to keep him in the apartment. According to Johnson, Burke misrepresented Johnson's statement by stating in the affidavit that Johnson had "admitted to arming himself with a knife and to engaging the Complainant in sexual intercourse." Johnson Compl. ¶ 22, App. 18. He thus contends that Burke "made material misrepresentations" without which the arrest "would have . . . been without probable cause in violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizure." *Id.* ¶ 64, App. 24.

Johnson's claim fails because the allegedly false statements were unnecessary to the finding of probable cause. *See Miller v. Prince George's Cty.*, 475 F.3d 621, 627–28 (4th Cir. 2007) (holding that a falsehood in an application for an arrest warrant does not violate the Constitution if it is not necessary to the finding of probable cause); *Vakilian v. Shaw*, 335 F.3d 509, 517–18 (6th Cir. 2003) (same); *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005) (same); *Wilson v. Russo*, 212 F.3d 781, 789–90 (3d Cir. 2000) (same). Even according to Johnson's own complaint, subtracting the allegedly falsified admission from the affidavit would have left in place a detailed victim statement identifying Johnson as the perpetrator. *See* Johnson Compl. ¶¶ 17–23, App. 17–18. Aside from Johnson's own protestations of innocence and his claims that the allegations against him had been fabricated by the alleged victim for reasons of jealousy, he has identified no independent reason the police officer might have doubted her credibility. And "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018); *cf.* Wayne LaFave et al., 2 Search & Seizure § 3.4(a) (5th ed. 2018) ("[W]hen information comes from one who claims to have witnessed a crime or to have been the victim of a crime, the information carries with it indicia of reliability and is presumed to be reliable." (internal quotation marks omitted)). The victim's allegations sufficed to support probable cause for the arrest warrant.

Johnson argues that Burke failed to investigate the conflicts between Johnson's and the alleged victim's accounts. Yet "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 990 (D.C. Cir. 2014) (citation omitted); *see also*

*Wesby*, 138 S. Ct. at 588. The same logic holds when an officer seeks an arrest warrant. Johnson's assertions of innocence do not vitiate probable cause.

Finally, Johnson's claims against the District of Columbia also cannot prevail. As the district court held, Johnson has not alleged that Detective Burke acted pursuant to a municipal policy or custom. As a result, there is no basis for municipal liability under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Los Angeles Cty. v. Humphries*, 562 U.S. 29, 30–31 (2010).

Johnson does not challenge that holding, but instead "clarif[ies]" that he seeks only the expungement of the government's files relating to his 1989 arrest. Johnson Br. 53. This court can order expungement of government records—including arrest records—as a remedy for certain violations of statutory or constitutional rights. *See Sullivan v. Murphy*, 478 F.2d 938, 968 (D.C. Cir. 1973); *see also Livingston v. U.S. Dep't of Justice,* 759 F.2d 74, 78 (D.C. Cir. 1985); *Doe v. Webster*, 606 F.2d 1226, 1230 (D.C. Cir. 1979). But Johnson has not demonstrated any violation of his Fourth Amendment rights—let alone the kind of flagrant violation that typically supports expungement of arrest records, *see Webster*, 606 F.2d at 1230—and he thus has shown no entitlement to any expungement. *See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 536–37 (D.C. Cir. 2015).

\*   \*   \*   \*   \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*