In the

# United States Court of Appeals

### For the Seventh Circuit

No. 15-3312

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL R. MORENO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 15-cr-00015 — **James D. Peterson**, *Judge.*

ARGUED DECEMBER 9, 2016 — DECIDED AUGUST 30, 2017

Before WILLIAMS and HAMILTON, *Circuit Judges,* and
CHANG, *District Judge.*[*]

CHANG, *District Judge.* Alpha-PVP is a designer drug that
produces a powerful stimulant effect in its users. This effect,
plus the drug's high potential for abuse, landed Alpha-PVP
on the federal government's Schedule I of controlled sub-

_____

[*]Of the Northern District of Illinois, sitting by designation.

stances. Michael Moreno pled guilty to importing Alpha-PVP from China and dealing the drug in northwestern Wisconsin. He now appeals the 80-month prison sentence imposed by the district court for that drug trafficking. Specifically, Moreno argues that the district court assigned the wrong offense level to Alpha-PVP when calculating the Sentencing Guidelines range. Alpha-PVP is not specifically listed in the Sentencing Guidelines drug-quantity tables, so the Guidelines required the district court to determine the "most closely related" controlled substance, U.S.S.G. § 2D1.1, appl. n.6, and then use that drug's offense level for Alpha-PVP. After holding an evidentiary hearing, the district court found that the most closely related drug is methcathinone, which is another Schedule I controlled substance. Although we have a different take than the district court on the *legal* question of how to apply the pertinent Guideline, we affirm because the district court's careful and thorough *factual* finding was correct.

**I.**

Moreno began selling Alpha-PVP (which is shorthand for Alpha-pyrrolidinovalerophenone) back in 2012, Presentence Report (PSR) ¶ 14, even before the designer drug was listed on any Schedule of controlled substances. On March 7, 2014, the federal government listed Alpha-PVP as a Schedule I controlled substance. Schedule I is reserved for those drugs that have a "high potential for abuse," have "no currently accepted medical use in treatment in the United States," and "lack … accepted safety for use," even under medical supervision. 21 U.S.C. § 812(b)(1)(A)-(C). After Alpha-PVP made it onto Schedule I, Moreno conspired to sell at least 2.1 kilo-

grams of it in northwestern Wisconsin. PSR ¶ 78. (For a sense of what that quantity means in practical terms, an individual dose of Alpha-PVP is around half a gram. Sentencing Tr. at 93.)

After Moreno pled guilty, the case headed to sentencing, with the primary dispute being what offense level to assign to Alpha-PVP. As noted earlier, because the Sentencing Guidelines do not explicitly set an offense level for Alpha-PVP, the district court had to figure out which controlled substance is "most closely related" to Alpha-PVP. U.S.S.G. § 2D1.1, appl. n.6. The government proposed methcathinone, which is another Schedule I controlled substance. In support of that proposal, the government offered the testimony of two DEA scientists and three users of Alpha-PVP. Against this, and in order to argue that a substance called pyro-valerone was more closely related, the defense proffered expert-witness declarations of a forensic scientist and a pharmacologist. (The defense declarations had been submitted in other cases; a fuller description of the parties' evidence is discussed later in this opinion.) After holding an evidentiary hearing, the district court found that the most closely related drug is, as proposed by the government, methcathinone. With that finding in place, the district court calculated the advisory Sentencing Guidelines range, considered the 18 U.S.C. § 3553(a) factors, and imposed a sentence of 80 months' imprisonment.

## II.

Usually, it is easy to figure out what Sentencing Guidelines offense level to assign to a particular quantity of drugs, because Guideline § 2D1.1 contains two tables that explicitly tell us the answer for the most commonly prosecuted drugs. U.S.S.G. § 2D1.1(c) (Drug Quantity Table), § 2D1.1, appl. n.8(D) (Drug Equivalency Tables). When a controlled substance does not appear on either table, the Guidelines require that the district court determine which controlled substance is "most closely related" to the drug at issue, and then use that controlled substance's offense level:

> In the case of a controlled substance that is not specifically referenced in this guideline, determine the base offense level using the marihuana equivalency of the most closely related controlled substance referenced in this guideline.

U.S.S.G. § 2D1.1, appl. n.6. The application note goes on and provides guidance on how to determine which controlled substance is most closely related to the one at issue. In essence, courts must look for similarities in chemical structure and in effects:

> In determining the most closely related controlled substance, the court shall, to the extent practicable, consider the following:
>
> > (A) Whether the controlled substance not referenced in this guideline has a chemical structure that is substantially similar to a controlled substance referenced in this guideline.

(B) Whether the controlled substance not referenced in this guideline has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance referenced in this guideline.

(C) Whether a lesser or greater quantity of the controlled substance not referenced in this guideline is needed to produce a substantially similar effect on the central nervous system as a controlled substance referenced in this guideline.

*Id.*

In this appeal, the threshold question is whether Moreno's proposed comparator, pyrovalerone, is even—as a matter of law—eligible to be considered as the most closely related substance to Alpha-PVP. The government argues that only those substances that explicitly appear—by *name*—on one of the Guidelines' drug tables (either the Drug Quantity Table, § 2D1.1(c), or the Drug Equivalency Table, § 2D1.1, appl. n.8(D)), can serve as a "most closely related" substance. The government grounds this argument on a clause in application note 6, which says that the district court should search for the "most closely related controlled substance *referenced in this guideline*." U.S.S.G. § 2D1.1, appl. n.6 (emphasis added). Also, each of the three considerations listed in the application note require the district court to compare the drug at issue with "a controlled substance *referenced in this guideline*." *Id.*, appl. n.6(A)-(C) (emphasis added). The government then points out that pyrovalerone is not expressly listed, by spe-

cific name, on either table, so it is ineligible to serve as a most closely related substance. Indeed, the Tables do not list any Schedule V drugs by name; instead, the Drug Equivalency Table groups them all under one entry for "Schedule V Substances." U.S.S.G. § 2D1.1 cmt. n.8(D).

Although the government's position has some force, it relies on too cramped a reading of the governing Guideline. The operative text at issue uses a term—"referenced"—that is broader in meaning than what the government proposes. The application note does *not* say that the sentencing court must search for the most closely related substance that is specifically "listed" or "named" in the guideline. Instead, the substance need only be "referenced" in the guideline. And Schedule V controlled substances are "referenced" in Guideline § 2D1.1: as noted earlier, the Drug Equivalency Table groups them all under one entry for "Schedule V Substances." U.S.S.G. § 2D1.1 cmt. n.8(D). To make the same point, as applied in this case: pyrovalerone is a Schedule V controlled substance and the Drug Equivalency Table assigns a marihuana equivalency to "Schedule V Substances," so that Table does *refer* to pyrovalerone. In light of the reference to Schedule V Substances, we hold that the application note allows defendants to propose a Schedule V controlled substance as the most closely related drug.[1]

Against this reading, the district court expressed concern that opening the substance-comparator analysis to all of the

---

[1] The Sentencing Commission is of course free to revise (or clarify) the application note so that the parties are limited to proposing only those controlled substances specifically listed in the Drug Tables by name.

controlled substances on all five DEA Schedules would make the decisional task all but unworkable, because there would be too many potential comparators. D. Ct. Opinion at 4. But there are already around 65 specifically named drugs on the Drug Equivalency Table, so adding the five specifically named Schedule V substances, 21 C.F.R. § 1308.15(d), (e), would not measurably increase the difficulty of the analysis. More to the point, expanding the potential comparators to include all controlled substances will not render the task unworkable. As a practical matter, the district court would not need to evaluate every single controlled substance because the government and the defendant will engage in an adversarial presentation, proposing what each believes is the most closely related substance—just as the parties did in this case. Indeed, even if the defendant refrains from affirmatively offering a particular controlled substance and simply puts the government to its burden of proof, still the district court would not actually be considering every controlled substance.

Remember too that the Guidelines instruct the parties and the district court to consider, to the extent practicable, three specific factors in determining the most closely related substance—and those factors will themselves serve a narrowing function in limiting the field of potential comparators. The first factor is similarity of chemical structure, so an expert immediately would be able to exclude substances with dissimilar chemical structures. The second and third factors—effect and potency—too will narrow down the potential comparators. Indeed, neither the government's ex-

perts nor the experts relied on by Moreno[2] expressed any concerns that the search for a most closely related substance was too difficult due to the number of controlled substances available for comparison. So there is no practical hurdle that undermines the plain-meaning interpretation of the Guidelines application note: Schedule V substances, like pyrovalerone, are "referenced" in the Drug Equivalency Table and neither the parties nor the district court need cabin the comparator search to the substances that are listed by specific name in the Table.

There is no need, however, for a re-do of the sentencing. The district court wisely chose to address whether methcathinone is in fact the most closely related substance to Alpha-PVP. To start, the district court noted how unusual it would be for a Schedule V substance (like pyrovalerone) to be the most closely related substance for a new Schedule I designer drug. Sentencing Op. at 4 n.3. By statutory definition, Schedule V substances must have a "currently accepted medical use," 21 U.S.C. § 812(b)(5)(B), which is a mismatch for a new designer drug that almost surely would not yet have undergone required testing for medical uses. Sentencing Op. at 4 n.3. To be sure, it is possible for the disputed designer drug to have been created many years ago; indeed, Alpha-PVP itself was patented in 1967, as part of a patent on a family of chemical compounds, so it is possible for a de-

---

[2] The expert reports offered by Moreno had been submitted in two other Alpha-PVP cases. *United States v. Brett Lawton et al.*, Case No. 13-cr-165 (D. Vt.) (Cozzi Declaration of Sept. 20, 2014); *United States v. Ryan Ellis et al.*, Case No. 13-cr-133 (D. Me.) (Bono Declaration of Sept. 22, 2014).

signer drug to have undergone testing. More importantly, however, Schedule V substances—again by statutory definition—must have only a "low potential for abuse," as well as causing only "limited" physical or psychological dependence, when viewed relative to Schedule IV substances. 21 U.S.C. § 812(b)(5)(A), (C). It is unlikely that makers and distributors of designer drugs would put in the resources to make, import, or sell (and take on the risk of selling) drugs with only the most limited potential for abuse. Unfortunately, the success of the illegal drug market is premised on promoting addiction in users to foster demand. So drug traffickers are not likely chomping at the bit to sell designer drugs that only have the effects and potency of Schedule V substances. It is true that, in light of the breadth of designer drugs, there might still be instances when a Schedule V drug ends up being the most closely related substance—but that is likely going to be rare.

Although pyrovalerone started out with two strikes against it, the district court also thoroughly considered each of the three factors set forth in application note 6 to Guidelines § 2D1.1. The first factor—similarity of chemical structure—did not significantly tip the scales much one way or the other (if anything, chemical-structure similarity did serve the narrowing function that we described earlier). DEA scientist Daniel Willenbring, whose job duties include analyzing drugs for assignment to the controlled substance Schedules, Sentencing Tr. at 14, explained that both methcathinone and Alpha-PVP share a "phenethylamine core structure," *id.* at 19-21. And both substances are classified as cathinones. Daniel Willenbring Report ¶ 7. At the same time, however, the expert declarations offered by the defense also showed

close structural similarity between pyrovalerone and Alpha-PVP. Among other things, pyrovalerone's chemical formula differed from Alpha-PVP's formula by only one methyl group ($CH_3$). Joseph Bono Report at 7-8. Not surprisingly, the district court correctly found that both the government and Moreno had persuasively shown that their respective proposed substances were both substantially similar in structure to Alpha-PVP.

So chemical structure alone did not answer the question as between methcathinone and pyrovalerone. Indeed, when the district court evaluated the scientific evidence on the second and third factors—effect and potency—the court concluded that the competing expert evidence did not conclusively show which substance was more closely related to Alpha-PVP. The *type* of effect produced by methcathinone use and pyrovalerone use is the same: they both have a stimulant effect (as distinct from a depressant or hallucinogenic effect) on the central nervous system. But the parties disputed the "maximum" effect of Alpha-PVP, as well as its potency. The maximum effect of a drug is the greatest pharmacological effect a drug can have, without regard to a limit on how much the user takes. Potency is a different kind of comparative measurement, specifically, the amount of a drug that is needed to produce the same effect when compared to another drug. The government's expert on these issues, Cassandra Prioleau, opined that Alpha-PVP is similar to methcathinone in effect and potency, but the opinion was premised on animal-based studies and review of some case reports provided by physicians or law enforcement to the DEA. And Prioleau did not examine the competing defense expert report except to "read them briefly," Sentencing Tr. at

79, nor was she able to testify specifically about the data discussed in the defense report, *id.* at 80-81. But the defense expert report too was flawed, as the district court found, because the report relied on information reported in a patent that *aggregated* data for a family of chemical compounds, rather than for Alpha-PVP specifically. D. Ct. Opinion at 8 (discussing U.S. Patent No. 3,314,970). Nor did the defense report directly rebut the government expert's opinion, because the defense report was obtained from another sentencing, rather than generated in this case.

Although the scientific evidence was a wash, the district court did find reliable the live, in-court testimony of three users of Alpha-PVP, and their testimony established that the powerful stimulant effect of the drug was more like methcathinone instead of the relatively mild pyrovalerone. Sentencing Tr. at 127-28 ("I think the stories of the witnesses that we've heard here today really supports the conclusion that we are not dealing with a drug as benign as … pyrovalerone."). The users described a litany of effects and addiction that went well beyond mild stimulus: "It just felt like something was … coming out of my skin," *id.* at 95; "I didn't sleep," "I didn't eat," "I lost about 80 pounds in two months," *id.* at 105; "it made you feel like you were going crazy," "couldn't think straight," *id.* at 115. Indeed, all three users testified that Alpha-PVP had an even more powerful effect than methamphetamine, *id.* at 96, 106, 115, which is treated by the Guidelines even more seriously than methcathinone, U.S.S.G. § 2D1.1, Drug Equivalency Table (setting marihuana equivalency of 2 kilograms for one gram of methamphetamine, and only 380 grams for one gram of methcathinone) (cited by D. Ct. Op. at 9). Based on the rec-

ord evidence, the district court committed no clear error in finding that methcathinone is the most closely related substance to Alpha-PVP.[3]

Moreno's remaining contention is that the district court supposedly treated the Sentencing Guidelines generally, and application note 6 to Guideline § 2D1.1 in particular, as "mandatory," Def.'s Br. at 31, and that the district court erred in doing so. It is not crystal clear where Moreno thinks the district court went wrong. To the extent that Moreno is arguing that, in calculating the advisory Guidelines range, the district court was not bound by the Guidelines, we reject that notion. Yes, district courts enjoy the discretion, in appropriate cases, to disagree with the views of the Sentencing Commission in deciding what the ultimate sentence ought to be under the overarching sentencing statute, 18 U.S.C. § 3553(a). *Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013) (citing *Pepper v. United States*, 562 U.S. 476, 501 (2011)). But the district court still must adhere to the Guidelines when *calculating* the advisory range. *Peugh*, 133 S. Ct. at 2080 ("First, 'a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.'") (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).

---

[3] The district court's finding is consistent with the other sentencing decisions issued after Alpha-PVP was added to Schedule I. *United States v. Emerson*, 2016 WL 1047006, at *4 (D. Vt. Mar. 10, 2016) (rejecting pyrovalerone in favor of methcathinone); *United States v. Brewer*, 2016 WL 3580614, at *15 (D. Me. June 28, 2016) (same). The Ninth Circuit also affirmed a methcathinone finding in an unpublished order, *United States v. Lane*, 616 Fed. App'x 328, 328 (9th Cir. Sept. 17, 2015), but the Ninth Circuit's local rules deem unpublished orders as non-precedential, 9th Cir. Rule 36-3(a).

So the district court correctly followed the Sentencing Guidelines and application note 6—without overlaying other § 3553(a) considerations—when calculating the advisory range.

To the extent that Moreno is arguing that the district court treated the advisory Guidelines range as mandatory, the record does not bear out that assertion. For one, the district court entertained defense counsel's arguments for a sentence below the advisory Guidelines range. *See* Sentencing Tr. at 146-58. Then the district court explained, in detail, why it was rejecting those arguments in imposing the sentence of 80 months' imprisonment, and not once mentioned that the Guidelines range required that sentence (nor did the court mention that the Guidelines range was presumptively the right sentence). *Id.* at 159-62. What's more, the district court imposed a below-Guidelines sentence on Moreno's codefendant at the same sentencing hearing in the same case. *See id.* at 163. So there is no reason to think that the district court treated the advisory range as mandatory.

There is one final possible variation of Moreno's argument that the district court treated the Guidelines as mandatory: under 18 U.S.C. § 3553(a), the district court should have considered pyrovalerone (and the Schedule V marihuana equivalency) as the most closely related substance. But that makes no sense because the district court rejected—as a factual matter—that Alpha-PVP had similar effects on users as pyrovalerone. It would be one thing if the district court had agreed that pyrovalerone was the right comparator but felt constrained from applying a Schedule V equivalency due to the court's interpretation of the Guidelines that the most closely related substance must be specifically named in the

Drug Tables. But that is not our case: instead, the district court carefully evaluated the evidence and found that pyro-valerone has effects that are dissimilar from Alpha-PVP. So it would not make sense for the district court to employ pyro-valerone in the § 3553(a) analysis at all. In no way did the district court err in its consideration of how the Guidelines interact with § 3553(a).

The judgment is affirmed.